**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

GARY ROLAND WELCH,

      Petitioner - Appellant,

v.

No. 07-5061

RANDALL G. WORKMAN, Warden,
Oklahoma State Penitentiary,

      Respondent - Appellee.

---

**Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 00-CV-105-CVE-PJC)**

---

**ORDER ADDRESSING PETITION FOR REHEARING
AND SUBSTITUTING NEW OPINION**

---

Before **O'BRIEN**, **TYMKOVICH**, and **HOLMES**, Circuit Judges.

---

Appellant, Gary Roland Welch, petitioned for panel and en banc rehearing.

Panel rehearing is granted for the limited purpose of addressing the issue Welch

raised in his petition for panel rehearing and clarifying that the panel reviewed the

Hardcastle family's victim impact testimony de novo, applying *Brecht v. Abrahamson*,

507 U.S. 619 (1993). The panel's original opinion will be amended to do so. The

opinion in this case dated June 07, 2010, *Welch v. Workman,* 607 F.3d 674 (10th Cir.

2010), is withdrawn and the attached opinion is substituted in its place. In all other respects, the petition for panel rehearing is denied.

The petition for rehearing en banc as well as the modified and substituted opinion was transmitted to all of the judges of the court in regular active service. As no member of the panel and no judge in regular active service on the court requested a poll, the petition for rehearing en banc is denied.

Additional petitions for rehearing in this matter will not be permitted. *See* 10th Cir. R. 40.3 ("[t]he court will accept only one petition for rehearing from any party to an appeal. No motion to reconsider the court's ruling on a petition for rehearing may be filed.").

Entered for the Court,

ELISABETH A. SHUMAKER, Clerk

FILED
United States Court of Appeals
Tenth Circuit

June 7, 2010

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

GARY ROLAND WELCH,

     Petitioner - Appellant,

v.

RANDALL G. WORKMAN, Warden,
Oklahoma State Penitentiary,

     Respondent - Appellee.

No. 07-5061

---

**Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 00-CV-105-CVE-PJC)**

---

James Hankins of Ogle & Welch, P.C. (Robert L. Wyatt of Wyatt Law Office with him
on the briefs) Oklahoma City, Oklahoma, for Petitioner–Appellant.

Robert Whittaker, Assistant Attorney General, (W.A. Drew Edmondson, Attorney
General of Oklahoma, with him on the briefs) for Respondent–Appellee.

---

Before **O'BRIEN**, **TYMKOVICH**, and **HOLMES**, Circuit Judges.

---

**O'BRIEN**, Circuit Judge.

---

     Gary Welch was sentenced to death after his conviction for the first degree murder

of Robert Hardcastle. After his conviction and sentence were affirmed on appeal and his

request for post-conviction relief was denied, Welch petitioned for writ of habeas corpus

under 28 U.S.C. § 2254. The district court denied his petition but granted a certificate of appealability on ten issues involving both the guilt and sentencing phase of his trial. We affirm.

## I.      EVIDENCE AT TRIAL

A.      Guilt Phase

Welch and his co-defendant, Claudie Conover, were charged with murdering Robert Hardcastle on August 25, 1994. At around 4:00 p.m. that day, Welch and Conover drove to the home of Johnny Rogers. Stephen St. John, Rogers' brother-in-law, testified he was present when they arrived. St. John saw his brother-in-law walk to Welch's car and heard Welch ask for a "bump" (a drug injection). (Vol. 5 at 1116, 1119.) When Rogers said he had none, Welch got out of the car and, pointing a knife at Rogers, said "Give me a god damned bump!" (*Id.* at 1120.) Welch turned the knife on St. John and told him to "look the other way." (*Id.* at 1121.) Welch continued to demand drugs until Conover patted him on the back and said "let's get out of here." (*Id.* at 1121-22.)

Approximately one hour later, Conover appeared at Larry Davis' home located in a duplex owned by Hardcastle. Davis and his wife lived in the front part of the duplex while Hardcastle resided in the back. Davis testified his friend was cooking dinner and Conover accepted an invitation to join them. Davis noticed a car parked toward the back, but saw only Conover at the time.

At some point, Davis went into the kitchen to help cook. While there, he heard banging noises coming from Hardcastle's residence. When he returned to the living

room, Davis said he "wondered if [Hardcastle] was winning his wrestling match." (*Id.* at 1161.) Conover jokingly replied, "I wouldn't worry about it. Somebody's probably getting a spanking over a deal." (Vol. 7 at 1563.) A few minutes later, Davis heard his living room window break. Turning, he saw Hardcastle running by the window yelling, "I don't have any" or "I didn't do it." (Vol. 5 at 1167.) Hardcastle then ran to Davis' porch; there was blood on his hands, forearms, face and bare chest. Both Conover and Davis went towards the door but when Conover went out first, Davis shut the door and returned to his distraught wife.

Patricia and Donnie Nading testified they were driving their children to football practice when, in Patricia's words, they "noticed a commotion at the side of the road." (Vol. 6 at 1255.) They saw three men run across the street in front of them. As the Nadings pulled even with the men, they saw Hardcastle crouched in a fetal position in the roadside ditch while Conover punched him and Welch stabbed and punched him. The Nadings pulled up to the next house and Donnie used the neighbor's telephone to call the police. While on the telephone, he spoke from a window with an unobstructed view of the activity. He saw the men continue to beat Hardcastle, as another car stopped and backed up toward the fracas. He saw Conover leave the victim and stride to the car. Banging on the back window and screaming profanities, Conover told the driver to leave. In the meantime, Welch continued to stab Hardcastle until, at one point, Welch left to retrieve a beer bottle five to seven feet away. Welch smashed the bottle and used it to stab and slash at Hardcastle.

While Conover was yelling at the first driver, a second car pulled up driven by

- 3 -

Rachelle Campbell. She saw Conover leave the first car and run toward a nearby house. The next thing she knew, a car pulled out and stopped to pick up Welch. Conover was driving; he drove the car toward her at a high speed, causing her to back into a ditch to avoid a collision. As the car drove by, Conover yelled profanities and told her to get out of the way. As the two men drove away, Campbell saw Hardcastle, covered with blood, come out of the ditch.

Officer Jim Gambill was the first officer to arrive at the scene. He had known Hardcastle since they were children. Hardcastle said, "Jim, Gary Welch did this shit to me." (*Id.* at 1411.) He then asked for water and collapsed. Gambill radioed the ambulance and asked the paramedics to hurry, then radioed in to report Welch as a suspect. Hardcastle died a few minutes later.

As they made their escape, Welch and Conover were seen by an officer who testified the car and its occupants matched the descriptions provided over the radio dispatch. Because the officer was in an unmarked car, he called for a marked backup and followed them. When the backup arrived, the officers stopped the car and arrested Welch and Conover. The officers then retrieved a broken knife which had been thrown out of the vehicle prior to its stop. At booking, a knife scabbard was taken from Welch's belt and another knife was found in the car. Welch had sustained a wound which totally penetrated his left forearm but he refused treatment that night. At one point he passed out in his cell. The next day, Welch was transferred to the hospital where he underwent surgery on the wound.

A search of Hardcastle's duplex revealed a major fight had taken place in the

kitchen and inside the front door. The autopsy report stated Hardcastle bled to death after receiving at least ten stab wounds, three of which penetrated his lungs, and numerous incision (slice) wounds.[1] Some of the wounds were consistent with the broken knife thrown from the vehicle and the superficial wounds were consistent with those caused by a broken beer bottle.

At trial, Welch testified he fought Hardcastle in self-defense. He explained that two weeks before the incident Hardcastle, who knew Welch did "skin illustrations," had spoken to him about getting a tattoo. (Vol. 8 at 1796.) Welch decided to visit with Hardcastle about the tattoo while Conover visited with Davis. According to Welch, he and Hardcastle had a pleasant visit until Hardcastle asked Welch to show him the knife he was carrying. When Welch handed Hardcastle the knife, Hardcastle opened it and began to clean his fingernails. Then Hardcastle's attitude abruptly changed. Welch stated that Hardcastle held the knife in a threatening way and said "you've been stepping on my old lady's toes," but he had no idea what Hardcastle was talking about. (Vol. 8 at 1825.) Hardcastle then thrust the knife at Welch, wounding him in his left arm as he raised it to protect himself.[2]

Welch claimed they began to fight while Hardcastle repeatedly tried to stab him.

---

[1] Dr. Ronald Distefano, the medical examiner, testified he defined an "incise wound" as a wound "caused by a sharp instrument." (R. Vol. 7 at 1722.) The term is used to differentiate such a wound from a stab wound. A stab wound is also from a sharp instrument but it is "essentially deeper than it is wide, whereas an incise wound is more wide than it is deep." (*Id*.)

[2] *But see* n.12, *infra*.

As Welch attempted to defend himself, Hardcastle eventually "went down" while still holding the knife. (*Id.* at 1838.) Welch escaped through the front door and hid behind the cars in the driveway. Hardcastle came out of the house and ran to the front duplex. Seeing Conover come out on the porch, Welch revealed his position and called to Conover for assistance. Hardcastle ran towards Welch, who fled across the street and then, in his own words, "turned, you know, to face the problem." (Vol. 8 at 1846.)

Obviously rejecting Welch's account of the situation, the jury found him guilty of first degree murder.

B.        Sentencing Phase

The State alleged three aggravating circumstances: (1) a previous felony conviction involving the use or threatened use of violence; (2) a probability of future criminal acts of violence constituting a continuing threat to society; and (3) the murder was especially heinous, atrocious and cruel. After incorporating the evidence from the guilt phase, the State introduced evidence of two prior felony convictions—aggravated assault and battery upon a police officer (1981) and assault and battery with a dangerous weapon after a former felony conviction (1982).

In support of the continuing threat aggravator, the State introduced testimony from several police officers recounting an incident from several years before in which Welch attacked an officer while being booked for driving under the influence. In addition, an officer from the Ottawa County Jail testified Welch had threatened him during Welch's present incarceration. A fellow inmate also testified Welch assaulted him while they were being held in the same cell.

The state presented evidence of a history of domestic violence. Two women testified Welch had assaulted them in the past. One stated Welch, while living in her home with his girlfriend, broke down her door, hit her and threw her against the Christmas tree. Welch's former girlfriend recounted one time Welch came to her home and demanded sex. When she refused, Welch beat her in the presence of her two minor children. Welch told the children to lie down and be quiet or he would kill them. He then tore her clothes off and put her head through a cabinet and a wall. Another time, she believed Welch was going to kill her so she fired a shotgun at him. When she missed, he took the gun, bent it, and hit her in the head with it. Yet another time, he found her in her yard and dragged her inside her home. There, Welch stuck her head in a washing machine, threw her down on a coffee table and held a knife to her throat.

The State's final witnesses were three members of Hardcastle's family. We discuss these statements in detail *infra*. Each family member characterized Welch as an "animal" or a "parasite" and implored the jury to impose death. (Vol. 9 at 2116, 2117, 2123, 2130.)

In mitigation, Welch presented the testimony of Dr. Phillip Murphy. He opined Welch's drug and alcohol abuse caused brain damage but his behavior could be managed with medication in a controlled environment. One man testified Welch was a good friend when he was not drinking or taking drugs and he would maintain this relationship if Welch's life was spared. Welch's wife testified she loved Welch and would continue this relationship if he let her. However, she admitted whether the death penalty should be imposed was a "hard question;" she knew he needed an environment where he could not

- 7 -

get drugs or alcohol. (*Id.* at 2174.) When asked if she had seen him express remorse for the incident, she did not answer directly but replied "[she had] seen a lot of different changes in [Welch] in the two years he's been in jail." (*Id.* at 2175.)

Cross examination revealed that Welch's wife had requested a protective order against Welch less than a month before Hardcastle's murder. She explained Welch had hit her, injuring her mouth and blackening her eye. He then forced her to take him to his girlfriend's house. The next day, Welch and his girlfriend returned and took a television, VCR and cable box from her home. They destroyed a window and air conditioner. The girlfriend left a threatening note.

Welch's mother was his final witness. Her testimony, however, was barely coherent. She had difficulty responding to questions and her answers rambled into nonsense. For example, when asked if there were times when social workers came to her home, she replied:

> No, they – they would – the city come out to our house, they come out there and said they wanted to go in and see if they help straighten things in school or something. And we didn't know . . . who they was and we thought they was going to go in there and get this – what this principal and stuff was doing in there to Gary. We didn't know though they was trying to trap us all. And trying to get us to do something to our son to where they could, you know, arrest us, or make us bad parents, in other words.

(*Id.* at 2183-84.)

During sentencing deliberations the jury sent two notes to the court relevant here. One note asked, "Can life without parole be reduced by appeal or pleas in the future?" Another asked, "Has anybody ever be[en] released with the sentencing of life without parole?" (Evidence Packet.) The trial court responded to each question, "I am not

allowed to answer this question." (*Id.*) After deliberating further, the jury returned with a death sentence, finding all three aggravating factors beyond a reasonable doubt.

## II.    PROCEDURAL HISTORY

The Oklahoma Court of Criminal Appeals (OCCA) affirmed Welch's conviction and sentence and denied a request for rehearing. *Welch v. State*, 968 P.2d 1231 (Okla. Crim. App. 1998). Welch's petition for a writ of certiorari was denied. *Welch v. Oklahoma*, 528 U.S. 829 (1999). After the OCCA affirmed the denial of Welch's application for post-conviction relief, *see Welch v. State*, 927 P.2d 26 (Okla. Crim. App. 1998), Welch filed his § 2254 habeas petition. The district court denied the petition, *Welch v. Sirmons*, No. 00-CV-0105-CVE-PJC, 2007 WL 927950 (N.D. Okla. Mar. 26, 2007), but granted a certificate of appealability on ten issues (R. Vol. 1, Doc. 51).

The issues relating to the guilt phase are whether:

(1)    prejudicial hearsay testimony was improperly admitted denying Welch an opportunity to confront a witness;

(2)    prosecutorial comments denied Welch a fair trial; and

(3)    the trial court failed to correctly instruct the jury.

Sentencing phase issues are whether:

(4)    improper victim impact statements resulted in the death penalty;

(5)    the trial court's answer to the jury's questions while deliberating on his   sentence rendered his sentencing fundamentally unfair;

(6)    the omission of a jury instruction at sentencing prevented consideration of mitigating factors;

(7)    aggravating factors were supported by either improper or insufficient evidence; and

(8)     the trial court erred in failing to instruct the jury it could reject the death penalty even if it found aggravating factors.

Finally, Welch claims (9) he received ineffective assistance of trial and appellate counsel and (10) the accumulation of error had a substantial and injurious effect on the verdict of guilt and his death sentence.

## III.     STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act (AEDPA), a petitioner is entitled to federal habeas relief only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). We presume the factual findings of the state court are correct unless the petitioner rebuts that presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "We review the district court's legal analysis of the state court decision de novo." *Bland v. Sirmons*, 459 F.3d 999, 1009 (10th Cir. 2006).

In applying § 2254(d), we first determine whether the principle of federal law on which the petitioner's claim is based was clearly established by the Supreme Court at the time of the state court judgment. *Id.* "[C]learly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case sub judice. Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context." *House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008). "The

absence of clearly established federal law is dispositive under § 2254(d)(1)." *Id.* at 1018.

Once the existence of clearly established federal law is confirmed:

> [W]e then consider whether the state court decision was 'contrary to' or an 'unreasonable application of' that clearly established federal law . . . . A decision is 'contrary to' clearly established federal law for purposes of § 2254 if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from the result reached by the Supreme Court.

*Bland*, 459 F.3d at 1009 (quotations omitted) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). A different result means the state decision must be "diametrically different" and "mutually opposed" to clearly established Supreme Court precedent. *Id.* "A state court decision involves an 'unreasonable application' of federal law if 'the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.*

If constitutional error is committed, we look to whether "the prejudicial impact of constitutional error in [the] state-court criminal trial" rises to the "substantial and injurious effect standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993)", and *O'Neal v. McAninch*, 513 U.S. 432 (1995). *Fry v. Pliler*, 551 U.S. 112, 120, 121 n.3 (2007). The standard applies "whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*." *Id.* at 121-122. It is important to note "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Brecht*, 507 U.S. at 634.

- 11 -

Under the *Brecht/McAninch* test a habeas petitioner obtains plenary review to determine whether a trial error "resulted in actual prejudice." *Id*. at 637 (quotations omitted). Under *O'Neal*, a "substantial and injurious effect" exists when the court finds itself in "grave doubt" about the effect of the error on the jury's verdict. 513 U.S. at 435. "[W]hen a court is 'in virtual equipoise as to the harmlessness of the error' under the *Brecht* standard, the court should 'treat the error . . . as if it affected the verdict . . . .'" *Fry*, 551 U.S. at 121 n.3 (quoting *O'Neal*, 513 U.S. at 435).

"The § 2254(d) standard does not apply to issues not decided on the merits by the state court." *Bland*, 459 F.3d at 1010. For those claims, "we review the district court's legal conclusions de novo and its factual findings for clear error . . . . However, if the district court based its factual findings entirely on the state court record, we review that record independently." *Id.* We "may not consider issues raised in a habeas petition that have been defaulted in state court on an independent and adequate procedural ground unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice." *House*, 527 F. 3d 1025.

## IV. DISCUSSION

### A. Proposition 1 - Hearsay Testimony

Because Conover was not available to testify at Welch's trial, Welch claims the trial court violated his right to confrontation when it allowed Davis to relate Conover's statement regarding somebody getting spanked over a deal. The trial court admitted the testimony under the co-conspirator rule. On direct appeal, the OCCA ruled its admission under this precept was error but the error was harmless because the testimony could

properly be admitted under the present sense impression exception to the hearsay rule. *Welch*, 968 P.2d at 1240.

The district court rejected Welch's confrontation clause claim, concluding the OCCA's determination the statement was a present sense impression was not an unreasonable application of federal law. It noted Welch's trial occurred before the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004).[3] Thus his claim was governed by the standard set forth in *Ohio v. Roberts*, 448 U.S. 56 (1980). Under the *Roberts* standard:

> [W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

448 U.S. at 66. The district court concluded the OCCA based its ruling "on a 'firmly rooted hearsay exception'" and, therefore, its ruling was not contrary to *Roberts*. *Welch*, 2007 WL 927950 at *10.

Welch argues the present sense impression exception does not apply because the statement was not used at trial to establish Conover's immediate impression. Rather, the statement was used to prove Welch's prior intent to "punish" Hardcastle.[4] (Vol. 8 at

---

[3] In *Crawford*, the Court stated: "Where testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." 541 U.S. at 68.

[4] In closing argument the prosecutor stated, "Spanking is a punishment. For what? I don't know. But it's a punishment. Welch went into this home with the intent of

1956-57.) Because the statement's purpose was not within the hearsay exception, Welch maintains his inability to cross-examine Conover on what he meant by those words violated his right to confront the State's witness and his right to a fair trial. Welch also argues under *Lee v. Illinois*, 476 U.S. 530 (1986), we must independently determine whether the statement is sufficiently reliable. We disagree.

Our review under AEDPA is limited. Notwithstanding the basis for the OCCA's conclusion, it determined the admission of the statement was harmless error. Therefore, we review only whether the admission of the testimony is harmless under the *Brecht* standard. *See Fry*, 551 U.S. at 121.

Welch maintains Conover's statement was testimonial and was not harmless because it was the only evidence of Welch's prior intent to harm Hardcastle (and contrary to his self-defense testimony). Even if we assume the statement was testimonial, numerous third-party eyewitnesses testified Welch repeatedly stabbed and beat Hardcastle while Conover held him down. Donnie Nading testified he saw Welch pursue Hardcastle, beat and stab him, and then leave Hardcastle in a fetal position to retrieve a beer bottle so the stabbing could continue. In light of the overwhelming evidence refuting Welch's self-defense testimony, we are confident the admission of Conover's statement did not have a substantial and injurious effect or influence on the jury's guilty verdict or the death sentence.

---

punishing Robert Hardcastle. He had to have that intention when he went in there because Claudie Conover . . . knew it, when he was over [at the Davis house]." (Vol. 8 at 1956-57.)

- 14 -

B.      Proposition 2 - Prosecutorial Comments

At trial, Welch's counsel asked him if he had a previous opportunity to tell his side

of the story. Welch responded, "I've been waiting almost two years to be able . . . to tell

what happen[ed]."  (Vol. 8 at 1794.)  On cross-examination, the prosecutor asked the

following questions:

> Q.     [Y]ou've also testified that at no time did any law enforcement
>        officers ask you what transpired in this case, is that correct?
>
> A.     No sir, they didn't.
>
> Q.     Do you recall any law enforcement officers talking with you about
>        your [physical] condition?[5]
>
> A.     No, I do not . . . .

. . . .

> Q.     You were subpoenaed as a witness [for Conover] in [his] case, were
>        you not?
>
> A.     Yes, sir.  I believe so.
>
> Q.     Did you come forward in that case and testify as to what transpired
>        to help your buddy out?
>
> A.     No, sir, I did not.

(Vol. 8 at 1922-26.)  On redirect, Welch clarified he had been subpoenaed but had not

been called to testify at Conover's trial.

In the state's rebuttal closing argument, the prosecutor briefly discussed Welch's

statement regarding the lack of opportunity to tell his story and said, "I suppose you all

---

[5] When arrested, Welch had sustained a deep knife wound which fully penetrated his left forearm.  Welch refused treatment but became unconscious while in custody.  He underwent surgery the next day.

- 15 -

have heard about the Fifth Amendment. You know we cannot make anybody make a statement." (Vol. 9 at 2002-03.) Defense counsel's contemporaneous objection was overruled.

On direct appeal, Welch maintained the cross-examination questions constituted prosecutorial misconduct which violated due process. The OCCA agreed but held the error was harmless beyond a reasonable doubt. *Welch*, 968 P.2d at 1240-41. During Welch's petition for post-conviction relief, he expanded his due process argument to allege not only the cross-examination questions but also the statements in closing argument, together, constituted an improper comment on Welch's post-arrest silence. The OCCA held this claim barred by res judicata because the comments during cross-examination were considered on direct appeal and Welch could not expand the claim in his post-conviction proceeding.[6] *Welch*, 972 P.2d at 29 n.3. "When a state court refuses to readjudicate a claim on the ground that it has been previously determined, the court's decision does not indicate that the claim has been procedurally defaulted. To the contrary, it provides strong evidence that the claim has already been given full consideration by the state courts and thus is ripe for federal adjudication." *Cone v. Bell*, 129 S. Ct. 1769, 1781 (2009). "A claim is procedurally barred [however], when it has not been fairly presented to the state courts for their initial consideration." *Id.* Accordingly, the district court

---

[6] Under Oklahoma law, claims previously raised and rejected are barred by res judicata. *See* Okla. Stat. tit 22 §§ 1086, 1089(C)(1). "Both the res judicata bar to claims previously rejected and the waiver rule for claims not previously raised . . . are included in Okla. Stat. Ann. tit. 22, §§ 1086 and 1089, and "both are regularly and even-handedly applied by the state courts." *Smallwood v. Gibson,* 191 F. 3d 1257, 1268 n.8 (10th Cir. 1999).

confined its review to the prosecutor's questions during cross-examination and denied relief.

Welch argues the district court erred by considering his argument regarding cross-examination and closing statements as discrete issues. He claims the prosecutor's comments on his right to silence constitute a single violation under *Doyle v. Ohio*, 426 U.S. 610 (1976), and the OCCA incorrectly determined this error harmless. *See Doyle*, 426 U.S. at 619 ("[T]he use for impeachment purposes of [defendant's] silence, at the time of arrest and after receiving Miranda warnings, violated the due process clause of the Fourteenth Amendment."). Welch did not mention the closing statements to the OCCA in his arguments on direct appeal. Rather, he argued the prosecutor's cross-examination questions were plain error. Therefore, to the extent this is a single claim of prosecutorial misconduct, we will not consider the expanded argument because it was not raised on direct appeal and the OCCA did not have the opportunity to consider the expanded argument on its merits. Welch is procedurally barred from expanding his argument or from raising new issues. *See Smallwood*, 191 F. 3d at 1268 n.8.

In any event, the expanded claim is harmless under *Brecht*. We must apply the *Brecht* standard "whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in *Chapman*." *Fry*, 551 U.S. at 121-22. Defense counsel's questions on redirect established Welch had not been called to testify at Conover's trial, thereby retiring any inference that Welch refused to testify on his friend's behalf. Even when the comments are considered as a whole, the overwhelming evidence presented in the guilt phase

- 17 -

negates any reasonable belief the prosecutor's minimal questioning and closing comments had a substantial and injurious effect on the jury's guilty verdict.

C.	Proposition 3 – Instruction on Second Degree Murder

At trial, Welch requested a series of second degree murder instructions found in the Oklahoma Uniform Jury Instructions (OUJI) for criminal cases.  (Vol. 8 at 1932-33 requesting instructions under OUJI-CR 449, 450 & 451.)  The trial court declined the instructions, finding insufficient evidence to support a verdict of second-degree murder. On direct appeal to the OCCA, Welch argued the trial court committed constitutional error in failing to instruct on this lesser included offense.  *See Schad v. Arizona*, 501 U.S. 625, 647-48 (1991) (while a jury need not be instructed on every lesser-included offense that may be supported, the jury must not be faced with an all (death) or nothing approach); *see also Beck v. Alabama*, 447 U.S. 625, 627 (1980) (jury must be permitted to consider a lesser included non-capital offense when the evidence would have supported such a verdict).  The OCCA held that because second degree murder is not a "lesser included offense of first degree malice murder" and the jury had been instructed on the lesser offense of first degree manslaughter, "the trial court did not err in refusing to give the instruction."  *Welch*, 968 P.2d at 1241.

Welch did not raise this issue in his state post-conviction proceedings.  In his habeas petition in the district court, however, he argued that shortly after the OCCA decided his case, it determined second-degree murder *was* a lesser-included offense of

- 18 -

first degree murder.[7]  He further contended the trial court violated his right to due process under *Matthews v. United States*, because "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."  485 U.S. 58, 63 (1988).  The district court rejected his arguments.

On appeal, Welch relies solely on *Matthews,* claiming the facts supported a finding of second-degree murder, and therefore, he was denied due process when the trial court failed to so instruct the jury.  However, this argument was rejected in *Schad*, a case decided after *Matthews*.  In *Schad*, the defendant claimed he was denied due process when the court failed to instruct the jury on robbery as well as first and second-degree murder.  The Supreme Court disagreed:

> Petitioner misapprehends the conceptual underpinnings of *Beck*.  Our fundamental concern in *Beck* was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all . . . .  We repeatedly stressed the all-or-nothing nature of the decision with which the jury was presented . . . .  This central concern of *Beck* simply is not implicated in the present case, for petitioner's jury was not faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence . . . .  [T]he fact that the jury's "third option" was second-degree murder rather than robbery does not diminish the reliability of the jury's capital murder verdict.

501 U.S. at 646-47.  Here, the jury was instructed on the non-capital crime of first-degree

---

[7] The OCCA relied on *Willingham v. State*, 947 P.2d 1074, 1081 (Okla. Crim. App. 1997). The OCCA reversed *Willingham* in *Shrum v. State*, 991 P.2d 1032 Okla. Crim. App. 1999) holding all degrees of murder are lesser-included offenses to murder in the first degree.

manslaughter. It "was not faced with an all-or-nothing choice." *Id.* at 647. Thus, the

OCCA's decision was not contrary to clearly established United States Supreme Court

precedent.

D.      Proposition 4 - Victim Impact Statements

At sentencing, Hardcastle's brother and parents testified by reading their written

victim impact statements to the jury. The statements, other than comments relating to the

testimony of Welch's witnesses, had previously been given to the defense. Hardcastle's

older brother testified:

> Gary Welch, with the aid of Claudie Conover, in August of '94, ended the
> life of my younger brother, Bob. Their cruel and inhuman actions have
> totally altered and devastated the lives of my entire family. The very fact
> that they, in cold blood, without any remorse, stabbed and mutilated my
> only brother in broad daylight, in front of numerous witnesses, has caused
> myself and the remainder of my family unending pain and untold suffering
> is difficult into words [sic].
>
> I think of my parents who have lovingly devoted their lives to raising two
> sons who would grow up to be men, married, and raise families of their
> own, only to have these dreams shattered.
>
> I think of myself and the love I've shared with my brother, the experiences
> growing up, and the interests we shared, and also the bitter disappointment
> that we won't be able to grow old together as brothers should.
>
> Most of all I think of his two little boys, Robert and James. They'll grow
> up to be men not knowing how much their daddy loved them, and what a
> kind and gentle person he really was. That, to me, is the biggest crime of
> all.
>
> The actions of Gary Welch and Claudie Conover have altered and changed
> and devastated the lives, hopes and dreams of my entire family. What is
> the price to be paid for the actions of these individuals, whose past criminal
> records and convictions clearly identify them as a menace to society. I've
> always had the philosophy of live and let live, but there has to be a point
> when we as a society have to say enough is enough.

- 20 -

There are people in this world who are parasites, they feed on the common decent people who work, live and conduct themselves in a decent and responsible manner who do not deserve to be violated by these people that have no sense of right or wrong or just don't care.

In this instance I tend to cry for revenge or vengeance. Sometimes it is hard to tell the difference. In the end I hope and pray justice will be served.

Q.    Mr. Hardcastle, do you have an opinion as to what punishment should Gary Welch have?

(Objection and discussion at bench)

Q.    I know this is difficult for you, but I ask if you'll look at the jury and tell them what you would like to have happen to the man who murdered your brother?

A.    Gary Welch deserves the death penalty. Give it to him, please.

(Vol. 9 at 2115-20.)

John Edwin Hardcastle, Robert's father, testified next:

Many repercussions to any crime, repercussions I have, my family has, and I would like to tell you about them. It is a very difficult thing worse, the loss of a son by a father. I was and am still completely devastated over the complete loss of my life will always be there. It will be there forever. I have loving memories of my son, as a baby. As a toddler, he was a little cotton top. He was a mama's baby. I watched him grow and I guided him the best I could growing up. Since he growed into manhood with all my hopes and my dreams for him. He brought into my life two beautiful twin grandsons. Now all the memories that I have of that is overshadowed by the horrible and inhumane way his life ended. My wife and I will never be the same. My son was a part of me and he was a part of her. It's as if that knife went into our hearts as well as his heart.

I speak also for my grandsons, Robert and James, who are not old enough to speak for themselves. The loss they suffered and they suffer now, and will all of their lives growing up without their father and without having his love and his guidance for them.

One of the hardest things I've ever had to do was to put my two grandsons on my lap, three and a half years old, and tell them that their daddy had been killed, and try to explain to them about death and where their daddy

- 21 -

was now.

> I can't stop thinking of what my son must have suffered. The pain and stark terror when Gary Welch and Claudie Conover took his life. I have never seen and I hope to never see again such cruelty and complete disregard for the human life. Like bloodthirsty animals, they chased my son down and they butchered him with a knife, showing no pity, mercy or feeling. They had opportunities to stop but that wasn't in the plan.
>
> I heard the last lady's testimony that Gary Welch threatened her babies to kill them. And I wondered if my grandbabies had been there that day, would they – would he have butchered them, too?
>
> Gary Welch, as Pattie and Donnie Nading testified, stabbed and slashed Bobby over and over and over. Look at a man that shows no remorse for what he's done. And his lawyer is gonna to ask you for a reduced sentence, for mercy. And I can't help but thinking that as my son lay in the ditch covered up and was trying to protect himself if he wasn't crying for mercy. But all he got was a knife and a broken bottle.
>
> I don't believe it's justice that my son lies in a cold grave and that Gary Welch should live. And I would ask the jury for justice for Bobby and to give this man the justice that they both deserve and I'd ask for the death penalty. Thank you.

(Vol. 9 at 2122-24.)

As he did after the first statement, counsel objected to the admission of the statement on the basis it was more prejudicial than probative and beyond the testimony allowed by statute. Counsel requested a mistrial and stated: "The State has prepared these statements and made them available to us and we've objected to them previously, and then we recognized the court's stand on that has been to allow it in." (*Id.* at 2125.) Counsel cited *Mitchell v. State*, 884 P.2d 1186, explaining, "While it doesn't deal squarely with the opinion evidence, which I'm objecting to, but it does deal squarely with the legal requirement that in order to allow victim impact evidence the court must weigh it in the same manner as other evidence . . . ." (Id. at 2126.) Acknowledging "there's

- 22 -

very little probative value in the statements" the court denied the motion for a mistrial.

(*Id.* at 2126-27.)

The State's final witness was Hardcastle's mother, Mary Gayle Hardcastle, who read the following statement:

> On July 17, 1959, God gave us a precious life, our son, Robert Hardcastle. On August the 25th, 1994, his life was taken from us, from his twin sons that were then three years old, from a family who loved him dearly, taken by a brutal, needless murder. We had no choice. We couldn't say good-bye, son, we love you. We couldn't touch his hand to let him know we were there with him. We had no choice at all.
>
> Words can never explain the pain it has put into our lives, the agony that we are enduring. The daily thoughts of this brutal day, the scene where he died and how he died. And not one night since his death have I gone to bed without dreaming of what he must have gone through, seeing his butchered body, knowing that he was crying out for help.
>
> His neighbor was there at the other side of the house, visiting with one of the murderers. Why? It's another question that we face daily.
>
> If we would have just gone by that evening, which wasn't unusual for us to do, maybe things would have been different today. And I've often wondered, too, if his babies were there would they have been dead?
>
> Needless to say that the pain has never let up.Twenty months later we cry, we ache each day. We go to the cemetery to find comfort or closeness to Bob. We look at a cold clod of dirt. We come home and we pray to God for relief, for understanding.
>
> And like my husband just said, if you've ever tried to explain to three year old babies that their daddy is never coming back because he's dead, then maybe you have a real idea of what pain is.
>
> We've had to answer questions like: Why is daddy dead? Why did the mean men hurt him? Are they going to hurt us? Will daddy come back and take us on vacation when our piggy bank is full? Which is something Bob had told them they would do. Is daddy going to be back for Christmas? Can daddy see us from heaven? And the list goes on and on.
>
> We've nursed both boys through nightmares and we know the hurt and the

pain they are having.  These two little boys loved their daddy, but now because of two murderous animals, and I do mean animals, they'll have to face life without him.  They will never be able to do all the things that fathers and sons do together and have the love that they once shared with him and know that he was there for them.

His brother has had to face his pain alone, living so far away from our family.  And we thank God every day that we still have him.

Robert had a great love for life and for people.  His greatest love was for his sons.  Love and respect for his grandparents.  He wasn't a church person.  He had his faults, as we all do, but we loved him with all of our hearts.  He loved God at one point in his life and lived and worked for God's cause, going to crusades with the youth of our church.  And in his adult years he did stray from God, but we had always hoped that he would come back to what he was taught and what he believed and God does promise us that.

No human being deserves to die the death that he did.  It was violent, it was brutal and it was needless.  And two men have been put on trial for his murder.  And there is no doubt that they're the ones who killed him.  They planned it.  They went to his home in broad daylight and they completed in a very brutal way what they intended to do.  And today one of them sits in this courtroom, smug and uncaring.  They've never shown one sign of remorse.  No shame.  Their wives and friends visited with them.  They're allowed to hug them, kiss them, touch them, visit with them every week, and we couldn't even say goodbye.

Sometimes my husband and I can't even communicate because of this murder.  A part of our lives is just one big void.  It can't ever be filled or changed or replaced.  Our hopes and dreams have been shattered forever.  And not only has this been a vast emotional problem to us and his boys, it's placed a number of loads on us that we just don't know how to deal with.

I would beg this court and this jury to see that justice is done.  And justice to us is no less than the death penalty.  Both Mr. Welch and Mr. Conover have a very long and vivid history of crimes of brutality.  Mr. Conover already was convicted of another murder for which he served only a few years.  And this was because he shot a woman for saying something that he just didn't like.

Through the jury selection of this trial, Mr. Robertson [defense counsel] has tried to impress on us the unfortunate childhood that Gary had and asked each one of you do you think a person should be given a more lenient

- 24 -

penalty. And if what we have been told is true, yes, he did have an undesirable early life. But does this give him the right to live above the laws of God and man, the right to brutally attack another human being, and the right to take a life?

I don't believe it does.

From the age of two until I was about nine I, too, had a very harsh childhood. My brother and I lived with a very brutal, drunken stepfather who physically abused our mother and both of us. But in spite of our unfortunate childhood, neither my brother [n]or I felt we had the right to disregard the law, to cause pain and suffering to other people through senseless means of brutal behavior. We've tried to live productive lives and raise our children to live the same way, respecting the rights and the laws of others. So, no, I can't believe that Mr. Welch's childhood should excuse him from the things that he has done as an adult, including the murderous act that took my son's life.

We are all capable of making choices in our lives. My brother and I chose to live by the law and to be responsible for our actions. And Gary Welch had a choice. He chose the path that brought him to this courtroom today. It was Gary Welch, not his family, not his mother, who took our son from us. And it is Gary Welch, not his family, who should be held responsible for his actions.

We can now only put our faith first in God and then our courts, and you, the jury. And I would beg you, please, don't let this happen to another family. And, again, I say I feel that he should be imposed the death penalty.

(Vol. 9, 2128-33.)

On direct appeal, Welch argued the admission of the family's testimony violated his rights under the Eighth and Fourteenth Amendments.[8] The OCCA, citing to its earlier

---

[8] Prior to Welch's trial, Conover was tried separately and sentenced to death. On direct appeal, Conover's conviction was affirmed but his sentence was reduced to life without parole due to the trial court's refusal to allow Conover to introduce evidence of Hardcastle's drug-related activities. *Conover v. State*, 933 P.2d 904, 922-23 (Okla. Crim. App. 1997). The OCCA also determined the trial court erred in admitting essentially the same victim impact statements admitted at Welch's trial but, because of the separate issue warranting relief, it did not reach the harmlessness of the error. *Id.* at 920-22.

- 25 -

decisions discussing the Supreme Court's decision in *Payne v. Tennessee*, 501 U.S. 808, 827 (1991), rejected the argument:

> This [Eighth Amendment] argument has previously been rejected in *Ledbetter v. State*, 933 P.2d 880, 889-90 (Okla. Cr. App. 1997) and *Cargle v. State*, 909 P.2d 806, 828 (Okla. Cr. 1995). *Cargle* sets out the basis the United States Supreme Court has utilized to find the Eighth Amendment is not violated by victim impact evidence and that the Fourteenth Amendment has the potential to be implicated if appropriate restrictions are not placed on victim impact evidence.

*Welch*, 968 P.2d at 1242. The OCCA held the admission of much of the victim impact testimony was error (violating the Fourteenth Amendment) but considered the error harmless beyond a reasonable doubt:

> In the present case, the jury was properly instructed on the use of victim impact evidence[9] and Appellant received sufficient notice of the victim
>
> ---
> [9] The jury was instructed as follows:
>
> The prosecution has introduced what is known as victim impact evidence. This evidence has been introduced to show the financial, emotional, psychological, or physical effects of the victim's death on the members of the victim's immediate family. It is intended to remind you that you as the sentencer that just as the Defendant should be considered as an individual, so to [*sic*] the victim is an individual whose death may represent a unique loss to society and the family. This evidence is simply another method of informing you about the specific harm caused by the crime in question. You may consider this evidence in determining an appropriate punishment. However, your consideration must be limited to a moral inquiry into the culpability of the defendant, not as an emotional response to the evidence.
>
> As it relates to the death penalty, victim impact evidence is not the same as aggravating circumstances. Proof of an adverse impact on the victim's family is not proof of an aggravating circumstance. Introduction of this victim impact evidence in no way relieves the State of its burden to prove beyond a reasonable doubt at least one aggravating circumstance which has been alleged.
>
> You may consider this victim impact evidence in determining the appropriateness of the death penalty, only if you first find that the existence

impact evidence to be introduced. Further, given the fact that we have determined, independently of the victim impact evidence, there was sufficient evidence to support three aggravating circumstances, we can safely hold that portion of the victim impact evidence which was improperly admitted was harmless beyond a reasonable doubt as the improperly admitted evidence does not undermine the reliability of the verdict as to the sentence imposed.

*Id*. at 1254.

The district court concluded the family's victim impact testimony violated both the Eighth and Fourteenth Amendments, specifically noting the family's recommendation of a death sentence was impermissible. Applying a deferential standard to the OCCA's conclusion that the error was harmless under *Chapman v. California*, 386 U.S. 18, 24 (1967), it determined the OCCA's decision was not objectively unreasonable,[10] saying:

> Several factors convince this Court that admission of the improper victim impact evidence in question was harmless error which does not warrant habeas relief. First, the evidence of Petitioner's guilt was substantial. Second, the jury found the existence of three aggravating circumstances beyond a reasonable doubt before recommending the death penalty for Petitioner. The jury found, based upon first stage evidence incorporated by reference in the second stage proceedings, that Petitioner's attack on Mr. Hardcastle was especially heinous, atrocious, and cruel. The jury also found that Petitioner was previously convicted of a felony or felonies

> of one or more of aggravating circumstances [sic] has been proven beyond a reasonable doubt by evidence independent from the victim impact evidence and find that the aggravating circumstance or circumstances found outweigh the finding of one or more mitigating circumstances.

> As it relates to the other sentencing options, you may consider this victim impact evidence in determining the appropriate punishment as warranted under the law and facts of the case.

*Welch*, 968 P.2d at 1254; (Vol. 9 at 2206-08.)

[10] Welch did not argue to the district court that it should apply a de novo standard of review as he now does. However, since the government did not object we consider it.

involving the use or threat of violence to the person. Finally, the jury found the existence of a probability that Petitioner would commit criminal acts of violence that would constitute a continuing threat to society. The evidence supporting the three aggravating circumstances, independent of the victim impact evidence, was ample.

*Welch*, 2007 WL 927950 at *22.

Welch argues he suffered actual prejudice in this instance because all three witnesses were allowed to testify at length to precisely the type of information precluded by the Supreme Court in *Booth v. Maryland*, 482 U.S. 496 (1987). Given the egregiousness of the error found in the statements' direct attacks on Welch's character, his mitigation evidence, the character of Welch's co-defendant and the pleas for the death sentence, Welch contends the admission of this testimony rendered his trial fundamentally unfair.

In *Booth*, the Supreme Court identified two categories of victim impact information which, if admitted, "creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." 482 U.S. at 502-503. The first category is testimony describing "the personal characteristics of the victims and the emotional impact of the crimes on the family." *Id.* at 502. The second is "the family members' opinions and characterizations of the crimes and the defendant." *Id.* In 1989, the Court extended the rule announced in *Booth* to statements made by a prosecutor to a capital sentencing jury regarding the victim's personal qualities. *See South Carolina v. Gathers*, 490 U.S. 805, 811 (1989).

In 1991, the Court expressly overruled at least part of its decisions in *Booth* and *Gathers*. *See Payne v. Tennessee*, 501 U.S. 808, 827 (1991). It held "the Eighth

- 28 -

Amendment erects no per se bar" to victim impact evidence concerning the specific impact of the crime on the family and a glimpse of the victim's life. *Id.* The only constitutional limitation on this evidence is imposed by the Due Process Clause's requirement of a fundamentally fair trial. *See [Frank ] Welch v. Sirmons*, 451 F.3d 675, 702-03 (10th Cir. 2006) (abrogated on other grounds). However, contrary to the OCCA's interpretation of *Payne*, we have stated, "the portion of *Booth* prohibiting family members of a victim from stating characterizations and opinions about the crime, the defendant, and the appropriate sentence during the penalty phase of a capital trial survived the holding in *Payne* and remains valid." *Id.* at 703 (quotations omitted).

The OCCA decided portions of the victim impact statements went outside constitutional bounds and were clearly error. It recognized "such statements as the victim was 'butchered like an animal', and that two men 'butchered him' have no place in a victim impact statement." *Welch*, 968 P.2d at 1242. Rather, the statements must be "restricted to the financial, emotional, psychological, and physical effects, or impact, of the crime itself on the victim's survivors; as well as some personal characteristics of the victim." *Id*. (quotations omitted). As a result, the OCCA applied the correct law to the first two categories of impermissible victim impact testimony.

However, the OCCA applied Oklahoma law which specifically allows the admission of the family's sentencing recommendation -- evidence precluded by our reading of Supreme Court precedent.[11] *See [Frank ] Welch*, 451 F.3d at 703. Although

_____

[11] *See* 22 Okla. Stat.§ 984 (1998). This statute defined admissible victim impact statements as "information about the financial, emotional, psychological, and physical

- 29 -

the OCCA reviews these statements "with a heightened degree of scrutiny," *Welch*, 968

P.2d at 1242, it "made no attempt to reconcile *Payne* or *Booth*" to the family's

recommendation of a death sentence. *[Frank ] Welch*, 451 F.3d at 703. Thus, the OCCA

did not consider the recommendations as constitutional error in its harmlessness analysis.

As a result, we determine de novo whether the erroneous admission of the victim impact

testimony so clearly swayed the jury as to cause Welch actual prejudice as required by

*Brecht*. In doing so, we are mindful that "an error that may justify reversal on direct

appeal will not necessarily support a collateral attack on a final judgment." *Brecht*, 507

U.S. at 634. We conclude Welch has not shown the victim impact statements caused him

actual prejudice.

Welch argues, because"[t]his case involved a grown-man on grown-man

homicide, a common method of murder (stabbing), and elements of mutual combat

[Welch's injury],"[12] the crime does not amount to the "worst of the worst" in capital case

---

effects of a violent crime on each victim and members of their immediate family, or person designated by the victim or by family members of the victim and includes information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence." *Id*. Section 984 was repealed in 2010 and re-enacted without change as 21 Okla. Stat. § 142A-1.

[12] The penetrating wound in Welch's arm caused an entry and exit wound of approximately the same size. It was undisputed at trial that only one knife was present during the fight. However, a second knife was found underneath the driver's seat in Conover's car when he and Welch were arrested. Also, undisputed testimony established that Conover used his car to spirit Welch away from the ditch where he was stabbing and cutting Hardcastle with a knife and broken bottle. The operating physician testified to his inability to distinguish the entry wound from the exit wound. However he did say either knife could have caused Welch's injury but the longer knife found in the car was more likely to cause an entry and exit wound of the same size. Consequently, the jury heard

jurisprudence.  (Appellant's Petition for Rehearing at 4.)  In addition, he contends actual prejudice is demonstrated by the jury's questions about life without parole – indicating the jury's struggle with the death penalty – and the trial court's failure to provide a definitive answer.

Assessing the improper parts of the victim impact evidence "in the context of other evidence presented," we conclude it did not have an actual impact on the sentence. *Id.* at 629.  In essence, Welch argues his acts were not heinous, atrocious and cruel.  But as discussed later, the evidence supporting the three aggravating factors presented in both stages of Welch's trial provided  strong support for a death sentence.  The witnesses testified Welch chased Hardcastle out of his home only to repeatedly stab him using both a knife and a broken beer bottle while Conover held the victim down.  Officer Gambill, who had known Hardcastle since they were children, could not immediately recognize Hardcastle when he arrived at the scene.  Hardcastle "was covered with blood and had severe wounds to his face . . . a large hole . . . in his left cheek."  (R. Vol. 6 at 1410.)  Medical testimony established that in addition to abrasions, cuts and superficial wounds, Hardcastle sustained twenty-one non-superficial wounds.

Moreover, the evidence established Welch's history was permeated with violent assaults, even while incarcerated pending trial in this case.  His own witnesses testified to his difficulty in controlling his rage. The jury also learned Welch had twice been

---

evidence that the knife likely causing Welch's wound was never at scene of the murder, but only in the getaway car – evidence of any attack on Welch by Hardcastle was hardly conclusive; perhaps not even credible.

convicted of felony assault and had, on at least one occasion, violated the conditions of his probation to the point probation was revoked. This was not a case in which there was simply sufficient evidence supporting the jury's finding of aggravating factors; the evidence was overwhelming in establishing the heinous nature of the crime and a dark history of violence by Welch.

The jury's parole questions and the district court's response do not suggest that Welch was actually prejudiced. At the end of the day, the jury was left with the same choices with which it began – death, life without parole or life. The instructions were clear and the court's response did not negate any of these choices. Further, the jury was correctly instructed on the use of mitigating evidence and its role in the sentencing deliberations. This is not to say the victim impact testimony here was only marginally offensive. The family members' testimony violated every category of impermissible expression. Had the evidence of the murder and the evidence of Welch's relentless violence against others been less graphic and compelling, the result may be different. But "[t]he principle that collateral review is different from direct review resounds throughout our habeas jurisprudence." *Brecht*, 507 U.S. at 633. Considering all of the evidence in both stages of this trial we cannot say the improper victim impact testimony impermissibly swayed the jury's verdict. *See [Frank] Welch*, 451 F.3d at 704*; Le v. Mullin*, 311 F.3d 1002, 1016 (10th Cir. 2002) (In a case in which the Oklahoma court applied the appropriate federal law, victim impact evidence was harmless given overwhelming evidence of guilt and evidence supporting aggravating factors coupled with instruction to the jury). We cannot conclude that the jury's verdict was substantially

- 32 -

influenced by the victim impact testimony.  *See Brecht*, 328 U.S. at 776.

E.     Proposition 5 – Response to Jury's Questions

During sentencing deliberations, the jury sent two notes to the judge relevant to the sentence.  It first asked, "Can life without parole be reduced by appeal or pleas in the future?"  (Ex. Pack.)  The court responded, "I am not allowed to answer this question." (*Id.*)  Undeterred, the jury sent a second note asking, "Has anybody ever be[en] released with the sentencing of life without parole?"  (*Id.*)  The court again responded it was not allowed to answer.  On direct appeal, Welch argued the judge's refusal to clarify the jury's obvious confusion denied him due process under *Simmons v. South Carolina*, 512 U.S. 154 (1994), and the error was plain.

> After reviewing relevant Oklahoma precedent, the OCCA said:
>
> The court's response to the jurors' questions in this case was non-responsive and as such forced the jury to fall back on the plain meaning of the instructions -- instructions which merely set out the three punishment options of death, life without parole and life imprisonment.  While the trial court could have specifically referred the jury back to those instructions, it was not required to further define the punishment options or explain the parole process.  We find the jury was not confused or misled by the court's response as Appellant has failed to show that when the jury returned its verdict on punishment that it was confused or misunderstood any of the three punishment options.

*Welch*, 968 P.2d at 1246 (citations omitted).[13]

---

[13] The OCCA apparently determined the trial judge erred under Oklahoma law because the jury was not reconvened to receive its answer as required by Okla. Stat. tit. 22, § 894.  *See Welch v. State*, 968 P.2d 1231, 1245 (Okla. Crim. App. 1998) ("Section 894 provides that when the jury has a question after it has started deliberations, they must be conducted into open court to receive their response in the presence of the defendant and all counsel concerned.  The record does not reflect that the jury was brought into the courtroom to receive the court's response.").  It found that error was harmless.  *Id*. at

In *Simmons*, the Supreme Court held when the defendant's future dangerousness is at issue, and the only available alternative sentence to death is life imprisonment without possibility of parole, due process requires that the sentencing jury be told the defendant is parole ineligible. *Id.* at 156. The Court reasoned that consideration of a defendant's future dangerousness is affected by the possibility the defendant may be allowed to return to society. *Id.* at 168-69. Similarly, in *Shafer v. South Carolina*, the Court held, because the jury was only given two sentencing options -- life imprisonment or death -- without being told the meaning of life imprisonment, the sentence must be reversed. 532 U.S. 36 (2001).

In applying *Simmons*, we have concluded that if the trial court simply directs the jury to review the instructions again, the defendant's due process rights are not violated. *See McCracken v. Gibson*, 268 F.3d 970, 980-81 (10th Cir. 2001); *McGregor v. Gibson*, 1246.

At present, the trial court's answer apparently would have been incorrect under Oklahoma law on another ground as well. After *Littlejohn v. State*, 85 P.3d 287, 293-94 (Okla. Crim. App. 2004), the judge has been encouraged to explain the instructions. In *Littlejohn*, the OCCA made clear that the trial court has three options for how to handle such a question from the jury:

> [I]n future cases where the jury during deliberations asks, in some form or fashion, whether an offender who is sentenced to life imprisonment without the possibility of parole is parole eligible, the trial court should either refer the jury back to the instructions, tell the jury that the punishment options are self explanatory, or advise the jury that the punishment options are to be understood in their plain and literal sense and that the defendant will not be eligible for parole if sentenced to life imprisonment without the possibility of parole.

*Id*. at 293-94 (citations omitted). Given that the court decided *Littlejohn* after this appeal was final, that rule does not apply in this case.

219 F.3d 1245, 1256 (10th Cir. 2000), *overruled en banc on other grounds by* 248 F.3d 946 (10th Cir. 2001). Conversely, in cases in which the trial court informs the jury that it is not to consider the issue of whether the defendant is parole ineligible, we have found a due process violation. *See Mollett v. Mullin*, 348 F.3d 902, 915 (10th Cir. 2003) (determining trial court violated defendant's due process rights by stating, "matters of parole are beyond the purvue [sic] of the jury or the court to consider") (quotation marks omitted); *Johnson v. Gibson*, 254 F.3d 1155, 1164, 1166 (10th Cir. 2001) (holding trial court's response, "[i]t is inappropriate for you to consider the question asked," "did more than give a non-responsive answer" but, contrary to Supreme Court precedent, "told the jury that parole eligibility could not be considered. . . .") (quotation marks omitted).

Even assuming the trial court's statement (that it was not allowed to answer the jury's questions) ran afoul of Oklahoma procedural law, its response simply could not have created a prohibited false choice under the United States Constitution. Failing to clarify the life without parole instruction cannot be "taken to mean that parole *was* available but that the jury, for some unstated reason, should be blind to this fact." *Shafer*, 532 U.S. at 53 (quotation marks omitted). Rather, as in *McCracken* and *McGregor*, the state trial court's non-responsive answer simply required the jury to return to the instructions as its sole guidance. And those instructions properly referred to Oklahoma's three-option sentencing scheme, offering the jury three choices--death, life imprisonment without parole and life imprisonment – which we have previously held to be constitutionally adequate. *Hamilton v. Mullin*, 436 F.3d 1181, 1191 (10th Cir. 2006).

The trial court's response to the jury's questions did not negate or contradict any

- 35 -

of these choices; each were explicitly set forth in the jury instructions and clearly presented in the verdict form. Moreover, evidence of Welch's future dangerousness demonstrated Welch's violence did not disappear at the prison gate. Not only was there evidence of a pattern of domestic violence, but several witnesses testified regarding Welch's outbursts while in custody. The OCCA reasonably found the trial court's response to the jury questions did not violate Welch's constitutional rights.

## F.     Proposition 7 - Aggravating Factors

Welch challenges two of the three aggravating factors found by the jury. He claims there was insufficient evidence to support the jury's determination his crime was "heinous, atrocious or cruel." He further contends the State used inadmissible evidence to prove the "continuing threat" aggravator.

### 1.   Heinous, Atrocious or Cruel

To find a murder heinous, atrocious or cruel, the State must prove the victim suffered torture or serious physical abuse. Serious physical abuse requires a showing the victim was subjected to "great physical anguish" or "extreme mental cruelty." *Neill v. State*, 896 P.2d 537, 555 (Okla. Crim. App. 1994). Welch argues Hardcastle's death, resulting from stab wounds occurring in a rather short period of time, cannot meet these standards.

Welch asserts the AEDPA standard of review does not apply to this claim because, on direct appeal, the OCCA reviewed this claim under an erroneous legal standard. The standard used by the OCCA was "whether there was any competent evidence to support the State's charge that the aggravating circumstance existed." *Welch*, 968 P.2d at 1246.

- 36 -

Welch argues the proper standard is articulated by the Supreme Court in *Jackson v. Virginia*, as follows: "whether any rational factfinder could have" found the existence of the prerequisite facts "beyond a reasonable doubt." 443 U.S. 307, 313 (1979). While Welch is correct the *Jackson* standard applies, he asserts without analysis that the standard used by the OCCA "is much different than the one in *Jackson* and also much more favorable to the State." (Appellant's Br. at 71.) We agree the wording of the standards is different but need not decide whether the standard used by the OCCA is contrary to *Jackson*. With or without AEDPA deference, the OCCA's ultimate determination is a reasonable application of *Jackson* based on the facts of this case.

The OCCA concluded the following facts supported the heinous, atrocious or cruel aggravating factor:

> [T]he evidence showed that the victim was conscious as he was attacked with a knife and a broken beer bottle and desperately sought to run away from his attacker and defend himself. He was able to talk with the first officer who responded to the scene and identify Appellant as the assailant . . . . [T]here was no need for the jury to speculate as to whether the victim remained conscious after the infliction of the initial wounds or whether he suffered mental anguish.
>
> Further, the evidence in this case showed the victim did not die immediately, but was left to languish from multiple knife wounds. Leaving a victim to linger and languish after he was stabbed is sufficient to support this aggravator.

*Welch*, 968 P.2d at 1247. Welch argues the OCCA's conclusion is contrary to other Oklahoma cases involving more gruesome factual circumstances where the OCCA held the evidence insufficient to support this aggravating factor. A careful reading of these cases reveals the OCCA's decisions reached a different result because the state had failed

- 37 -

to show the victim was conscious or establish the death was not nearly instantaneous. Those doubts are not present here.

"[T]o evaluate whether the 'heinous, atrocious, or cruel' aggravating circumstance was properly applied, we must examine the state court's findings as to the duration of conscious suffering on the part of the victim." *Medlock v. Ward*, 200 F.3d. 1314, 1324 (10th Cir. 2000) (Lucero, J., concurring).The jury heard evidence of a fight that continued from Hardcastle's home into the street where he fled. He appeared at the doorway bleeding. In the street, Conover held him down and punched him. Welch repeatedly stabbed him. During the struggle his clothes were stripped from his body. Given the evidence adduced in the guilt stage and incorporated into the sentencing stage, a rational trier of fact could have found the existence of great physical and mental anguish before his death. And "despite the omission of the word 'physical,' from the instruction, the instruction still performed its required narrowing function and imposed restraint upon the sentencer." *Miller v. Mullin*, 354 F.3d 1288, 1300 (10th Cir. 2004).Thus, the OCCA's conclusion is not an unreasonable determination of the facts or contrary to clearly established federal law.

2. Continuing Threat

Welch contends the continuing threat aggravator was supported primarily by unadjudicated offenses. Welch concedes unadjudicated crimes or a past history of lawlessness may be used to prove he poses a "continuing threat" to society. *See Jurek v. Texas*, 428 U.S. 262, 276 (1976) ("What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must

determine."); *Knighton v. Mullin*, 293 F.3d 1165, 1172 (10th Cir. 2002) ("The Constitution . . . does not preclude a capital sentencer from considering unadjudicated bad acts."). However, Welch complains "the relatively minor incidents from the early 1980s were too remote" and "the evidence allowed was overbroad and irrelevant." (Appellant's Br. at 77.) This assertion minimizes the seriousness and, more importantly, the consistency of Welch's violent behavior. In any event, Welch fails to direct us to any Supreme Court precedent holding the admission of similar unadjudicated crimes is a violation of constitutional proportion. This claim is without merit.

G.      Propositions 6 & 8 – Sentencing Phase Instructions

Welch offered a sentencing instruction which asked the jury to consider the following mitigating evidence: the effects of his substance abuse and childhood trauma causing mental impairment; the love of friends and family members continuing after imprisonment; the ability to control his mental impairment through deprivation of drugs and alcohol; and how he would benefit from a controlled environment such as prison. The trial court refused the instruction. Instead, it instructed the jury: "Mitigating circumstances are those which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability or blame. The determination of what are mitigating circumstances is for you as jurors to resolve under the facts and circumstances of this case." (R. Vol. 2 at 432.)

On direct appeal, Welch argued the trial court erred when it failed to give his requested instruction and the error was exacerbated when the court instructed that mitigating circumstances "may be considered." He claims, together, those actions

- 39 -

presented an impermissible risk the jury would disregard the mitigating evidence altogether. The OCCA rejected Welch's claim because the instructions as a whole did not prevent the jury from considering the evidence nor was there "a reasonable likelihood the jury failed to consider the evidence offered in mitigation." *Welch*, 968 P.2d at 1245.

Welch maintains the OCCA's ruling is contrary to *Penry v. Lynaugh*, 492 U.S. 302 (1989) (*Penry I*) (*overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002)), *Eddings v. Oklahoma*, 455 U.S. 104 (1982), and *Lockett v. Ohio*, 438 U.S. 586 (1978).[14] "In *Lockett*, a plurality of the Court decided that an Ohio death penalty statute that limited the jury's consideration to specified mitigating circumstances violated the constitutional requirement of individualized sentencing in capital cases." *Saffle v. Parks*, 494 U.S. 484, 489 (1990). In *Eddings*, the Court applied *Lockett* and ruled "a sentencing judge's refusal, as a matter of law, to consider mitigating evidence presented by a capital defendant concerning his family history and upbringing was constitutional error." *Id.* The Court reasoned "it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf." *Eddings*, 455 U.S. at 114. These principles were applied in *Penry I*, where the Court held the Texas death penalty scheme allowing the jury to consider only the answer to two questions before applying the death

[14] Welch also claims the instruction given to the jury impermissibly ties the mitigating evidence to "those things that reduce the degree of moral culpability or blame for committing the crime. It does not explain clearly to the jury that mitigating evidence may also include characteristics personal to the accused that have no relation to the crime at all." (Appellant's Br. at 67.) This argument was not raised in the state or district courts and Welch offers no justification for a deviation from our general rule refusing to address arguments presented for the first time on appeal. *See United States v. Mora*, 293 F.3d 1213, 1216 (10th Cir. 2002). Therefore, this argument will not be considered.

penalty prevented the jury from considering and giving effect to certain types of mitigating evidence. As recently explained by the Supreme Court:

> [S]entencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future.

*Abdul-Kabir v. Quartermain*, 550 U.S. 233, 246 (2007). A reviewing court must determine "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. Calif.*, 494 U.S. 370, 380 (1990). The instructions are considered as a whole.

There is no Supreme Court precedent requiring a trial court to affirmatively instruct on the specific mitigating evidence the defendant wishes the jury to consider. Therefore, this claim fails under AEDPA. *See Smith v. Spisak*, -- U.S. --, 130 S.Ct. 676, 684 (2010) (no right to habeas relief if Supreme Court has not previously held jury instruction unconstitutional for same reason); *see also Knowles v. Mirzayance,* -- U.S. --, 129 S. Ct. 1411, 1419 (2009) (legal rule must be "squarely established" by Supreme Court). In addition, the OCCA correctly noted *Penry 1* and its predecessors involved instructions "which improperly limit[ed] the jury's consideration of certain evidence [in addition to] the absence of an instruction specifically directing their consideration of certain evidence." *Welch*, 968 P.2d at 1244. Here, Welch's jury was not prevented from considering mitigating evidence and was specifically instructed it was limited only by its own judgment.

In *Smallwood v. Gibson*, 191 F.3d 1257, 1271 (10th Cir. 1999) and *Boyd v. Ward*, 179 F.3d 904, 924 (10th Cir. 1999), we rejected the argument that the use of the word "may" in a mitigating evidence instruction permitted the jury to ignore mitigating evidence. Welch concedes this point but maintains his case is distinct because, unlike *Boyd v. Ward*, the trial court refused his instruction listing the mitigating evidence. Welch asserts "[t]his extra component of the instructions is of constitutional importance" because it provides the "vehicle to give effect to the mitigation evidence in a constitutional manner." (Appellant's Br. at 80, 81.)

In *Boyd v. Ward*, the trial court gave an identical instruction on mitigating evidence as was given here. 179 F.3d at 924. We held:

> The use of the word "may" does not alone compel the conclusion that the jury was empowered to ignore mitigating evidence. Moreover, instruction number nine[15] told the jury it "shall" consider certain minimum mitigating

---

[15] Instruction 9 read:

You are instructed that mitigating circumstances are not specifically enumerated in the Statutes of this State but the law of this State sets up certain minimum mitigating circumstances you shall follow as guidelines in determining which sentence you impose in this case. You shall consider any or all of these minimum mitigating circumstances which you find apply to the facts and circumstances of this case. You are not limited in your consideration to these minimum mitigating circumstances. You may consider any additional mitigating circumstance, if any, you find from the evidence in this case. What are and what are not additional mitigating circumstances are for you the jury to determine.

Evidence has been offered as to the following mitigating circumstances:

    1. The Defendant did not plan to kill the deceased.

Whether these circumstances existed and what degree and weight you are to place on them must be decided by you.

- 42 -

circumstances and "may" consider any additional mitigating circumstances. There is no reasonable likelihood that the jury applied the instructions in such a way that it was prevented from considering mitigating evidence.

*Id.* Even so, Welch claims our decision in *Boyd v. Ward* suggested the Oklahoma instruction would not pass constitutional muster in the absence of an instruction listing mitigating circumstances. That is not the case. Our mention of the additional instruction was merely to reinforce the OCCA's determination the jury did not misapprehend its duty.

"[A] capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an [impermissible] inhibition" in considering mitigating evidence. *Boyde*, 494 U.S. at 380.

Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Id.* at 380-81.

Looking to the instructions as a whole, the jury was told the meaning of mitigation and instructed it must unanimously find the existence of the aggravating factors beyond a reasonable doubt. It was also instructed that even if the aggravating factors were found to exist, it was authorized to consider the death penalty only if it found the aggravating factors outweighed the mitigating evidence. Given these instructions, the OCCA's conclusion is not contrary to or an unreasonable application of clearly established federal

---

*Boyde*, 179 F.3d at 924.

- 43 -

law.

Finally, Welch argues the failure to instruct the jury that it could consider a sentence of life or life without the possibility of parole even if it found the existence of one or more aggravating factors violated his rights under the Eighth and Fourteenth Amendments. He concedes we have rejected this precise claim in *Fox v. Ward*, 200 F.3d 1286, 1300-01 (10th Cir. 2000). He presents no new argument and therefore, we deny this claim for the same reasons articulated in *Fox*.

H.      Proposition 9 - Ineffective Assistance of Trial and Appellate Counsel

The OCCA rejected Welch's claims that both his trial counsel and appellate counsel provided ineffective assistance. To prevail, Welch must establish trial counsel's (1) "representation fell below an objective standard of reasonableness," and (2) there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). To establish the prejudice prong at sentencing, Welch must demonstrate, "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. Our review is "highly deferential." *Id.* at 689. Recently, the Supreme Court recognized *Strickland* created a general standard, thus giving "a state court . . . even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles*, 129 S.Ct. at 1420; *see also Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule,

the more leeway courts have in reaching outcomes in case-by-case determinations.")

Thus, our review should be "doubly deferential." *Knowles*, 129 S.Ct. at 1420. And we

"indulge in a strong presumption that counsel's conduct falls within the wide range of

reasonable professional assistance; that is, the defendant must overcome the presumption

that, under the circumstances, the challenged action might be considered sound trial

strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks omitted).

Welch posits four reasons why his trial counsel was ineffective, all of which

impermissibly led the jury to impose the death penalty.

### 1. Failure to Cross-Examine Regarding Hardcastle's Drug Activity.

Welch contends trial counsel's failure to cross-examine witnesses at both the guilt

and the penalty phase and the failure to introduce evidence regarding Hardcastle's drug

dealing prejudiced his defense. He claims, had the jury heard this evidence, it would

have supported his self-defense theory by showing Hardcastle was capable of violent and

unpredictable actions "that go with that lifestyle." (Appellant's Br. at 88.) At the penalty

phase, such evidence would have countered the State's presentation (through the victim

impact statements) of Hardcastle as "just a normal guy who was married and had

children." (*Id.* at 87.) The fact Hardcastle dealt drugs would have shown "his lifestyle

was one in which he was likely to end up in a bad situation and thus he did not have

entirely 'clean hands' in the situation." (*Id.* at 88.)

Welch raised this claim on direct appeal. The OCCA determined counsel's failure

to introduce this evidence was reasonable trial strategy at both stages of the trial. At the

guilt stage, the OCCA determined "it would only have served to strengthen the State's

- 45 -

theory that [Welch] killed the victim when he failed to provide the drugs." *Welch*, 968

P.2d at 1252. At the penalty stage, it concluded "the decision to cross-examine relatives

of the victim on negative aspects of the victim's character is a matter best left to trial

counsel who observes the witnesses and jury first hand." *Id.*

Welch argues the OCCA's reasoning is deficient, especially in light of its reversal

of Conover's death penalty on the same grounds. But Conover and Welch had separate

trials with differing defense theories. The theory at Conover's trial was Hardcastle's

involvement with drugs demonstrated "Welch went to the victim's home to purchase

drugs and not to kill him and therefore neither Welch nor [Conover] acted with

premeditation." *Conover*, 933 P.2d at 912. The trial court did not allow evidence of

Hardcastle's drug activities as support for Conover's theory. At sentencing, Conover

again attempted to elicit this evidence but the trial court again refused. The OCCA

reversed Conover's death sentence, finding the evidence admissible and the trial court's

refusal to admit it was error which affected the reliability of the sentencing procedure.

Welch's trial strategy was quite different. Welch denied he went to Hardcastle's

looking for drugs and testified he just wanted to discuss a tattoo. Consequently, counsel

did not attempt to introduce evidence of Hardcastle's drug dealing. Welch argues that

counsel's decision not to introduce this evidence was not a reasonable trial strategy.

Counsel's performance must be "completely unreasonable" to be constitutionally

ineffective, "not merely wrong." *Hoxsie v. Kerby*, 108 F.3d 1239, 1246 (10th Cir.1997).

As the OCCA noted, Welch's testimony was he acted in self-defense. He did not

mention any involvement with drugs and denied he threatened Rogers or St. John earlier

that day to gain access to drugs. Therefore, the OCCA's conclusion that trial counsel's strategy to forego a theory invoking Welch's search for drugs is not unreasonable, particularly under the double deference test.

While the strategy to avoid this evidence during the sentencing phase is less obvious, we do not determine counsel's effectiveness through a rear view mirror. The Supreme Court requires we make "every effort . . . to eliminate the distorting effects of hindsight" by indulging in a strong presumption counsel acted reasonably. *Strickland*, 466 U.S. at 689. As the OCCA observed, we cannot know the interaction between the victim's family and the jury during the penalty phase. It is not unreasonable to avoid questions requiring the family to speak ill of the deceased for fear the jury's anger would settle on the defendant. The OCCA's conclusion that trial counsel was not ineffective for failing to elicit evidence of Hardcastle's drug activity at sentencing is not contrary to clearly established federal law.

2. Failure to Object to Erroneous Penalty Phase Instruction.

Welch next claims trial counsel's failure to object to the jury instruction defining the heinous, atrocious or cruel aggravator was ineffective assistance of counsel. While the OCCA held counsel should have objected to the instruction's use of the phrase "serious abuse" rather than "serious physical abuse," it concluded the failure to object did not prejudice the defendant. *Welch*, 968 P.2d at 1247-48. We agree. There is no question the evidence at trial established Hardcastle suffered serious physical abuse. Thus, the evidence at trial supports the OCCA's determination that the difference in the language "could have had no impact on the sentencing decision." *Id.* at 1248.

3. Failure to Challenge Improper Voir Dire.

During voir dire, the prosecutor asked all but two members of the jury questions similar to the following: "Do you feel like something like a poor childhood is a reason to not assess the death penalty? . . . If there is evidence as to drug involvement, or alcohol involvement, things of that nature, do you feel that in and of itself is a reason to not assess the death penalty? (Tr. Vol. 2 at 431, 438, 447, 437; Vol. 3 at 553, 731; Vol. 4 at 876, 901, 958, 982.) The prosecutor received a negative answer from each juror. Welch maintains these questions impermissibly secured an agreement from the jurors to ignore Welch's mitigation evidence, thus ensuring a death sentence. He claims trial counsel's failure to object to this line of questioning constituted ineffective assistance of counsel under *Strickland*. While ineffective assistance of trial counsel was raised on direct appeal, it did not include a claim based on voir dire. When raised in Welch's petition for post-conviction relief, the OCCA held this aspect of his ineffective assistance of counsel claim was barred by res judicata. *Welch*, 972 P.2d at 28-29.

"On habeas review, this court does not address issues that have been defaulted in state court on an independent and adequate state procedural ground, unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice." *English v. Cody*, 146 F.3d 1257, 1259 (10th Cir. 1998). The Oklahoma requirement that a claim of ineffective assistance of trial counsel be raised on direct appeal is an adequate ground for procedural default if (1) the defendant's counsel on direct appeal is different from trial counsel and (2) the claims can be resolved on the trial record alone. *Id.* at 1263. Welch concedes he had different counsel on appeal and the claim could have been resolved on

- 48 -

the trial record alone. Therefore, habeas review of this claim on the merits is barred unless Welch can show "cause for the default and prejudice resulting therefrom, or that failure to review his claim[s] will result in a fundamental miscarriage of justice." *Hickman v. Spears*, 160 F.3d 1269, 1272 (10th Cir. 1998).

Welch contends he met the cause and prejudice requirement because his appellate counsel was ineffective in failing to raise his trial counsel's ineffectiveness during voir dire, especially when considered in conjunction with the trial court's refusal to give a specific instruction listing the mitigation factors. *Mitchell v. Gibson*, 262 F.3d 1036, 1057 (10th Cir. 2001) (quotations omitted). The OCCA determined Welch's appellate counsel was not ineffective by applying the test set out in *Walker v. State*, 933 P.2d at 334. *See Welch*, 972 P.2d 29-30. But we have held the *Walker* test "is contrary to federal law." *DeLozier v. Sirmons,* 531 F.3d 1306, 1331 (10th Cir. 2008), *cert. denied*, 1295 S. Ct. 2058 (2009). We, therefore, do not defer to the OCCA's ruling but review appellate counsel's performance de novo. *Id.*

If Welch cannot show trial counsel was ineffective, then he cannot show "cause" (ineffective appellate representation) for his procedural default. *Sherrill v. Hargett*, 184 F.3d 1172, 1175-1176 (10th Cir. 1999). In addition, while "[a] claim of appellate ineffectiveness can be based on counsel's failure to raise a particular issue on appeal, . . . counsel 'need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.'" *Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003) (quoting *Smith v. Robbins*, 528 U.S. 259, 288 (2000)). "[I]f the omitted issue has merit but is not so compelling, [we assess] the

issue relative to the rest of the appeal, and deferential consideration must be given to any professional judgment involved in its omission; of course, if the issue is meritless, its omission will not constitute deficient performance." *Id.*

We first look to the predicate inquiry, whether trial counsel performance was unreasonably deficient and whether it prejudiced Welch. He has failed to show the latter. Assuming, arguendo, trial counsel's failure to object to the State's voir dire was deficient performance, counsel was not ineffective because the error did not prejudice Welch's defense. A capital jury is not required to find any particular evidence must be given mitigating effect or weight. *Boyde*, 494 U.S. at 377. There is a constitutional violation only if there exists a reasonable likelihood that the jurors believed themselves *precluded* from considering relevant mitigating evidence. *Id.* at 386. Put differently, the jury must be the body that decides the weight or effect given to the evidence.

The questions asked during voir dire did not preclude the jury from considering Welch's evidence. After the State's allegedly improper questions to the jury, defense counsel questioned each juror to assure individual willingness to consider every form of punishment in the event they found Welch guilty, as well as each juror's willingness to adhere to the court's instructions. Given these circumstances, we cannot say there is a reasonable likelihood the prosecutor's questions affected the jury's decision on guilt or sentencing. Moreover, the prosecutor's questions were irrelevant to guilt and the evidence supporting the aggravating factors was sufficient to impose the death sentence, even considering all mitigating evidence. Because Welch cannot show trial counsel's alleged error caused prejudice, his ineffective assistance of appellate counsel claim must

fail.  Therefore, he cannot avoid the procedural bar.

> ### 4.  Failure to Develop And Present Mitigating Evidence.

> #### *a)  Trial Counsel's Ineffectiveness*

Welch asserts trial counsel was ineffective for failing to present additional mitigating evidence at sentencing.  Prior to trial, clinical social worker Fran St. Peters evaluated Welch and concluded Welch should be evaluated by a neuropsychologist.  She reported Welch had "memory interruptions," "grandiose delusions" and detailed Welch's abuse as a child as well as the history of mental illness in his family.  Reports from juvenile authorities also documented Welch's problems as a juvenile and indicated he had been chained by his parents as a child.  Welch claims trial counsel's failure to introduce this evidence deprived the jury of an understanding of the full picture of his childhood's severe emotional and physical abuse which prevented him from learning to socialize like normal children.

The OCCA and the district court held this claim of ineffective assistance of trial counsel was procedurally barred because it had not been raised on direct appeal and "[did] not turn on facts or information unavailable at the time of his direct appeal." *Welch*, 972 P.2d at 29; *see also* Okla. Stat. tit. 22, § 1089(C) ("[t]he only issues that may be raised in an application for post-conviction relief are those that . . . [w]ere not and could not have been raised in a direct appeal.").

Welch claims the procedural bar should not apply here because his ineffectiveness claim could not "be resolved on the trial record alone."  (Appellant's Br. at 93.)  And Welch now adds an argument that the procedural bar is not adequate because it is not

strictly or regularly followed. But this argument, raised for the first time in this Court, was specifically noted for its absence by the district court. *See Welch*, 2007 WL 927950 at *42 n.26.[16]

Our cases (and more important, Supreme Court Cases) do not prevent Oklahoma from requiring ineffectiveness of trial counsel claims to be raised on direct appeal. *English,* 146 F.3d at 1263. Our cases do require procedures that: "(1) allow petitioner an opportunity to consult with separate counsel on appeal in order to obtain an objective assessment of trial counsel's performance and (2) provide a procedural mechanism whereby a petitioner can adequately develop the factual basis of his claims of ineffectiveness." *Id.* Under OCCA Rule 3.11, a defendant may request an evidentiary hearing "[w]hen an allegation of the ineffective assistance of trial counsel is predicated upon an allegation of failure of trial counsel to properly utilize available evidence or adequately investigate to identify evidence which could have been made available during the course of the trial." Okla. Stat. tit. 22, ch. 18, app., Rule 3.11(B)(3)(b). "However, we have been skeptical of whether Rule 3.11 is sufficient to satisfy" a procedural mechanism by which a defendant can supplement the record. *Fairchild v. Workman*, 579

---

[16] Footnote 26 states:

The Court need not address whether Oklahoma's procedural rules are adequately and evenhandedly applied because Petitioner does not address his alleged procedural default, let alone challenge the adequacy of Oklahoma's procedural rules. *See Spears v. Mullin*, 343 F.3d 1215, 1252 (10th Cir.2003); *Hooks v. Ward*, 184 F.3d 1206, 1215 (10th Cir.1999) (concluding it is habeas petitioner's burden to challenge the adequacy of a state procedural bar).

F.3d 1134, 1142-43 (10th Cir. 2009). Nonetheless, because Welch did not challenge the method by which he could supplement the facts on appeal to the State or federal district court, any argument that he was not provided an adequate procedure is waived. Therefore, we do not consider it here. *Cone*, 129 S. Ct. at 1780 ("When a petitioner fails to properly raise his federal claims in state court, he deprives the State of an opportunity to address those claims in the first instance and frustrates the State's ability to honor his constitutional rights.") (quotations omitted); *see also United States v. Avalos*, 506 F.3d 972, 977 (10th Cir. 2007) (issues not raised below are waived). In any event, as discussed below, trial counsel presented mitigating evidence of Welch's difficult childhood and it is highly unlikely further mitigation evidence would have changed his sentence.

5. Ineffectiveness of Appellate Counsel.

Welch contends his claim of trial counsel's ineffective investigation and presentation of mitigating evidence should not have been subjected to the procedural bar. That is because his appellate counsel was ineffective for failing to raise this claim. We review this claim de novo because the OCCA determined appellate counsel was effective under the *Walker* test, an incorrect standard.

Welch must show appellate counsel's representation fell "below an objective standard of reasonableness" in light of "prevailing professional norms." *Strickland*, 466 U.S. at 688. We "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and avoid judging counsel's performance using the distorting benefit of hindsight. *Id.* at 689 (quotations omitted).

- 53 -

The Supreme Court recently reiterated we may consider the standards in effect at the time of counsel's representation as "guides" but "the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." *Bobby v. Van Hook*, --- U.S. ---, ---, 130 S. Ct. 13, 17 (2009) (quotations omitted). Even assuming Welch could show trial counsel's failure to present St. Peter's testimony and his juvenile records fell below that standard, he must then show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

> When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer -- including an appellate court, to the extent it independently reweighs the evidence -- would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.
>
> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id.* at 695-96.

Welch's trial "counsel . . . presented more than a skeletal case in mitigation." *Welch*, 2007 WL 927950 at *44 (distinguishing *Anderson v. Sirmons*, 476 F.3d 1131, 1142 (10th Cir. 2007). Dr. Murphy testified Welch suffered from psychological

- 54 -

problems and related the "possible causes from his background." *Id.* While petitioner's

mother's testimony was of limited coherence, she provided some "insight into

Petitioner's childhood behavioral problems." *Id.* Even if St. Peters or another expert

could have given a more detailed account, "counsel is not required to keep hiring experts

until the most favorable one possible is found." *DeLozier*, 531 F.3d at 1333. The

evidence of aggravating factors was especially persuasive. As discussed above, Welch

had a violent history on the street and in confinement. Under the law at the time of

appeal, appellate counsel may have reasonably believed the additional evidence was no

more meritorious than other issues argued on direct appeal. Because Welch has not

shown appellate counsel ignored a compelling issue or that the additional evidence would

reasonably likely have changed the jury's sentence, he cannot succeed on his claim of

ineffective assistance of appellate counsel.

I.      Proposition 10 – Cumulative Error

Welch maintains the actual errors determined by the OCCA, and those he asserts

on appeal, cannot be found harmless when considered in the aggregate. "A cumulative-

error analysis aggregates all errors found to be harmless and analyzes whether their

cumulative effect on the outcome of the trial is such that collectively they can no longer

be determined to be harmless." *United States v. Toles*, 297 F.3d 959, 972 (10th Cir.

2002) (quotations omitted).

Here, we have determined, as did the OCCA and the district court, that the trial

court erred in allowing the prosecution to comment on Welch's post-arrest silence and in

admitting a substantial portion of the victim impact statements. The district court, as did

the OCCA, determined reversal is not warranted.  We agree.  After careful review of the record and the arguments on appeal, we cannot say the cumulative effect of the errors deprived Welch of a fair trial.

**AFFIRMED**.